## NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION, Appellant,

v.

## PUBLIC SERVICE COMMISSION OF INDIANA, Wabash Valley Power Association, Inc., Office of the Utility Consumer Counselor, City of Fort Wayne, Indiana, Public Service Company of Indiana, Inc., Fruit Belt Electric Cooperative, Jay County REMC, United REMC, Warren County REMC, Boone County REMC, Kankakee Valley REMC, and United States of America on Behalf of its Rural Electrification Administration, Department of Agriculture, Appellees.

### No. 93A02–8702–EX–58.

Court of Appeals of Indiana,
Third District.

Sept. 12, 1988.
Rehearing Denied Dec. 7, 1988.

---

Fred E. Schlegel, Michael J. Huston, Mary M. Stanley, Baker & Daniels, Indianapolis (Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for appellant Nat. Rural Utilities Co-op. Finance Corp.

Bradley L. Williams, Deborah J. Daniels, U.S. Attys., Richard K. Willard, John R. Bolton, Asst. Attys. Gen., Jeffrey L. Hunter, Gerald A. Coraz, Asst. U.S. Attys., Indianapolis, for intervenor-appellant U.S., on behalf of its Rural Electrification Admin., Dept. of Agriculture.

Linley E. Pearson, Atty. Gen., Brenda Franklin Rodeheffer, Deputy Atty. Gen., Indianapolis, for appellee Indiana Utility Regulatory Com'n.

Don F. Morton, Parr, Richey, Obremskey & Morton, Indianapolis, for appellee Wabash Valley Power Ass'n, Inc.

Thomas E. Kieper, Consumer Counselor, James W. Burk, Asst. Consumer Counselor, Office of Utility Consumer Counselor, Indianapolis, for appellee Office of Utility Consumer Counselor.

Dykema Gossett, Albert Ernst, Margaret A. Morris, Dean Van Drasek, Lansing (John Coldren, Coldren & Frantz, Portland, of counsel), for intervenors-appellees Jay County REMC, United REMC, Warren County REMC, Boone County REMC and Fruit Belt Elec. Co-op.

William M. Evans, Bose McKinney & Evans, Indianapolis (Leo Clifford, Clifford, Clauden & Alexa, Valparaiso, of counsel), for intervenor-appellee Kankakee Valley REMC.

GARRARD, Presiding Judge.

This is an appeal from the dismissal by the Public Service Commission of Indiana [1] (Commission) of Wabash Valley Power Association's (Wabash) petition for a rate increase. The following issues are raised by this appeal:

1) Whether the Commission had jurisdiction of the petition for rate increase;

2) Whether the Commission abused its discretion by dismissing the petition on its merits rather than for lack of prosecution;

3) Whether the Commission erred in concluding that Wabash was not entitled to the rate relief it requested;

4) Whether the Commission erred in dismissing the petition without considering whether Wabash was entitled to emergency rate relief; and

5) Whether the Commission's dismissal of the petition violated Wabash's constitutional right not to have its property taken without just compensation.

We affirm.

Wabash is an Indiana not-for-profit utility corporation organized under IC 23–7–1.1. (1982) (amended 1986 P.L. 149).[2] Wabash's stockholders are twenty-four REMCs or electric cooperatives. Wabash negotiates wholesale power rates with four investor-owned utilities on behalf of its stockholders and also represents its stockholders in the development of their own generation and transmission facilities. Wabash is owned by its stockholders and governed by a board of directors which consists of one director from each member system.

In January of 1978, when the Commission approved Wabash's request to own generation and transmission facilities, it also approved Wabash's request to invest borrowed funds in Public Service Company of Indiana's nuclear generation project, commonly known as Marble Hill. Subsequent to the Commission's approval to borrow funds, Wabash received approval of its application to borrow $360,684,000.00 from the Rural Electrification Administration of the United States government (REA). After borrowing the funds and pursuant to the Commission's original order approving the investment, Wabash twice applied and was granted approval for funds it expended on Marble Hill.

Due to construction delays and cost escalations, the Governor of Indiana appointed a task force to review the Marble Hill project and thereafter the task force recommended cancellation. Public Service Company of Indiana suspended construction and later announced it was financially unable to continue the project. After PSI discontinued construction, the REA notified Wabash that it could no longer continue to advance guaranteed funds on the project. Approximately two months later, however, the REA approved Wabash's request to use $12,017,000.00 of the guaranteed loan funds to pay interest due on the outstanding loan funds that had been advanced on the project. The REA also recommended that Wabash investigate other financial resources to meet future debt service payments until rates were sufficient to meet all of Wabash's revenue requirements.

On April 6, 1984, Wabash filed the petition in this case to increase its rates by

1. The Commission is now called the Indiana Utility Regulatory Commission.

2. A brief submitted by several of Wabash's members informs this court that in a previous case the Commission determined that Wabash is a public utility within the meaning of the Public Service Commission Act, IC 8–1–2– et seq. and therefore is subject to rate of return methodology applicable to investor owned utilities under IC 8–1–2–4. Wabash's articles of incorporation, however, specifically provide that it is a not-for-profit corporation whose purpose is to provide electricity at the lowest cost possible consistent with prudent management (R. 1106). The not-for-profit nature and the purpose of Wabash's existence appear to clearly place it within the Rural Electric Membership Corporation Act, IC 8–1–13 et seq. and therefore subject to the recovery of cost methodology under IC 8–1–13–17. Interestingly, the Commission's order encompasses analysis under both provisions, none of the parties raised the issue of which statute is applicable and all parties have briefed the case as if Wabash was subject to IC 8–1–13. Our opinion thus assumes that is the case. It should be noted, however, that if Wabash is subject to IC 8–1–2, NIPSCO is directly applicable to this case and therefore the result would be the same.

fifty-one percent to pay debts it incurred through its participation in Marble Hill. The REA was permitted to intervene and recommended that Wabash be allowed to borrow additional funds from the National Rural Utilities Cooperative Finance Corporation (CFC) so that Wabash could repay its debts on a phased-in approach. The Commission approved the recommendation and pursuant to that approval, Wabash borrowed approximately $8,600,000.00 from CFC. CFC and several of Wabash's members were also permitted to intervene in the rate case.

Wabash presented its case in chief on September 27, 1984 and three weeks later the Office of the Utility Consumer Counselor (Consumer Counselor) requested a continuance on the grounds that Wabash was required to show that its decision to participate in the Marble Hill project was a prudent one. On December 6, 1984 the Commission established a new test year for the proceeding and directed Wabash to present evidence on the prudence of its involvement in Marble Hill and evidence on both rate of return and revenue requirement bases of setting rates. On January 31, 1985, Wabash requested leave to file a supplemental or amended petition for emergency rate relief and shortly thereafter, the Consumer Counselor filed its motion to dismiss the petition on the grounds that Wabash was not entitled to relief under this court's opinion in *Citizens Action Coalition v. Northern Pub. Serv. Co. of Ind. (NIPSCO)* (1984), Ind.App., 472 N.E.2d 938. In that case we held that the Commission could not permit an investor-owned utility to recover costs associated with a cancelled nuclear plant through rate increases. The Commission granted Wabash's request to file a supplemental petition for emergency rate relief but advised that any proceedings on the petition would be stayed until the Indiana Supreme Court ruled upon the *NIPSCO* case. Wabash did not file a supplemental petition but moved for a temporary stay of the proceedings on its original petition. The Commission granted this mo-

tion on May 23, 1985 and the same day Wabash filed for reorganization under Chapter Eleven of the United States Bankruptcy Code.

On November 19, 1985 the Indiana Supreme Court filed its opinion in *NIPSCO*, affirming this court's decision. (1985), Ind., 485 N.E.2d 610. On April 25, 1986, the Consumer Counselor once again moved to dismiss Wabash's petition and the parties to the proceeding, including the intervenors, filed briefs and memoranda in support of their positions. On January 14, 1987, the Commission entered an interim order dismissing Wabash's petition after noting that Wabash's only reason for requesting rate relief was to recover costs associated with Marble Hill and that under *NIPSCO* such costs were not recoverable through rates. The Commission granted Wabash ten days to amend its petition to seek relief on a basis not related to Marble Hill costs but Wabash did not file an amended petition. On January 28, 1987, the Commission issued its final order of dismissal and this appeal ensued.[3]

█ The REA first contends that the dismissal order constitutes an advisory opinion or a declaratory judgment and the Commission therefore lacked jurisdiction to enter it. The REA first argues that the order constitutes an advisory opinion because Wabash did not strongly support its petition thereby causing no case or controversy to be before the Commission. We agree that jurisdiction requires an actual existing justiciable controversy between parties having adverse interests. *City of Evansville v. Grissom* (1976), 169 Ind.App. 467, 469, 349 N.E.2d 207, 209. The requirement of adverse parties, however, is related to standing and that concept focuses upon whether the complaining party is the proper person or entity to invoke the court's, or in this case, the Commission's, jurisdiction. *City of Indianapolis v. Indiana State Bd. of Tax Commr's.* (1974), 261 Ind. 635, 638, 308 N.E.2d 868, 870. This case involved a request for a rate

---

**3.** The appellants in this appeal are the REA and CFC, Wabash's creditors. Wabash and its intervening members submitted appellee briefs along with the Commission and the Consumer Counselor.

increase which could not have been granted without the Commission's approval. IC 8–1–2–42 (1982 & Supp.1987). The Commission thus not only had jurisdiction but had primary jurisdiction. Wabash was the entity which needed the rate increase and therefore certainly was the proper party to invoke the Commission's jurisdiction. "The judicial doctrines of justiciability and standing exist to insure that litigation will be actively and vigorously contested...." *Indiana Educ. Employment Relations Bd. v. Benton Comm. Schools* (1977), 266 Ind. 491, 496, 365 N.E.2d 752, 754. While Wabash may have had doubts as to the likelihood of its request being granted, this case was argued vigorously by the parties and the intervenors and the decision has an immediate impact upon the rights of Wabash and its creditors. This is the essence of a case or controversy and the Commission's order therefore does not constitute an advisory opinion.

█ The REA also contends that no factual record exists as to whether Wabash was entitled to emergency rate relief and without such a record the Commission prematurely issued a legal opinion which constitutes a declaratory judgment. In support of its argument, the REA cites *U.S. Steel Corp. v. Northern Ind. Pub. Serv. Co.* (1985), Ind.App., 482 N.E.2d 501, and *Kentucky–Indiana Power Ass'n. v. Public Serv. Comm.* (1979), 181 Ind.App. 639, 393 N.E.2d 776. While those cases do support the proposition that the Commission may

not enter declaratory judgments because the Commission's duty is to enter orders based upon impartial findings of fact, neither case involved a petition for a rate increase. The parties in the cases cited by the REA sought to have their rights, status and relations determined and the court held that such relief was declaratory in nature and therefore not within the power of the Commission to grant. The Commission's order in this case dismissed Wabash's petition for a rate increase because it found that the sole reason for the request was to recover costs associated with Marble Hill. Although the Commission's order was certainly based upon its legal opinion that *NIPSCO* was applicable to Wabash's petition, an administrative body does not lose its jurisdiction simply because a purely legal issue is involved. *Thompson v. Medical Licensing Bd.* (1979), 180 Ind.App. 333, 398 N.E.2d 679, *cert. denied* 449 U.S. 397, 101 S.Ct. 335, 66 L.Ed.2d 160. By dismissing Wabash's petition with prejudice, the Commission effectively denied Wabash a rate increase. The action was a ruling upon an existing petition. It did not constitute an impermissible declaratory judgment even though the rights of the creditors may have been affected by it.[4]

█ The REA and CFC contend that the Commission erred in dismissing Wabash's petition on the merits when it could have been dismissed procedurally for failure to prosecute under 170 I.A.C. 1–1–21 (1988). That provision, however, states that the

---

**4.** In its brief, the REA implies that the Commission's order constitutes a rule rather than an adjudication and that the Commission erred by failing to follow the rulemaking requirements of IC 4–22–2 (1982 & Supp.1987). We disagree that the Commission engaged in its rulemaking function when it entered its order dismissing Wabash's petition.

The rulemaking function is distinguished from the adjudicatory function in that the former embraces an element of generality, operating upon a class of individuals or situations whereas an adjudication operates upon a particular individual or circumstance. In addition, the exercise of administrative rulemaking power looks to the future, whereas an adjudication operates retrospectively upon events which occurred in the past. *Blinzinger v. Americana Healthcare Corp.* (1984), Ind.App., 466 N.E.2d 1371, 1375 citing *Beacon*

*Nat. Life Ins. Co. v. Texas Bd. of Ins.* (Tex.Civ. App.1979), 582 S.W.2d 616; *Strumsky v. San Diego Employees Retirement Ass'n.* (1974), 11 Cal.3d 28, 112 Cal.Rptr. 805, 520 P.2d 29. The Commission's order dismissing Wabash's petition for a rate increase operated only upon Wabash, not upon all Indiana electric cooperatives. Furthermore, the order operated upon past events, Wabash's participation in Marble Hill which resulted in debts Wabash cannot pay. The order was an adjudication of whether Wabash could recover the costs of its participation by increasing its rates. The order dismissing Wabash's petition answers that question in the negative. Although the basis for the Commission's dismissal, the application of the *NIPSCO* holding to cooperatively owned utilities may affect similarly situated utilities, it will do so only as precedent not as a rule of general applicability.

Commission "may, in its discretion, dismiss" a petition when the proceeding has been inactive for six months after notice has been given to the parties that dismissal will occur. 170 I.A.C. 1–1–21 (1988). In addition to the fact that Wabash did not receive the notice required by the statute, the provision is a discretionary one. Given the importance of the Supreme Court's ruling in *NIPSCO* to the outcome of this case and the fact that Wabash requested a stay of the proceedings, we cannot say the Commission abused its discretion by dismissing the petition upon its merits rather than for failure to prosecute under 170 I.A.C. 1–1–21.

■ The REA and CFC next contend that the Commission erred in concluding that *Citizens Action Coalition v. Northern Ind. Pub. Serv. Comm. (NIPSCO)* (1985), Ind., 485 N.E.2d 610, is applicable to Wabash's petition for rate increase. In *NIPSCO* our Supreme Court held that an investor-owned utility cannot, through a rate increase, recover costs associated with a facility which never was used or useful in the production of energy. *Id.*, affirming (1984), Ind.App., 472 N.E.2d 938. The creditors make several arguments to support their contention.

The creditors first argue that *NIPSCO* is inapplicable to the present case because Wabash's ratepayers are its owners and thus should bear the risk of loss in the same manner as the investors should bear the risk of loss in an investor-owned utility. They cite three separate types of authority in support of their argument.

First, the creditors cite cases from other jurisdictions in which the courts stated that members of an electric cooperative are both its customers and stockholders. The issues involved in the cases they cite, however, are totally different than the issue involved in this case. In *Ozark Border Elec. Coop. v. Stacy* (Mo.App.1961), 348 S.W.2d 586, the court held that because the members of an electric cooperative were essentially stockholders of the corporation, they were incompetent to sit on a jury involving a contract dispute where the cooperative was the plaintiff. In so holding,

however, the court stated that *"in so far as the problem under discussion [was] concerned"* it appeared that the cooperative did not importantly differ from other corporations in corporate existence and function. *Id.* at 588 (emphasis in original). The question of who should bear the risk of loss for a cancelled nuclear plant is quite distinguishable from whether a cooperative's members are competent jurors in a suit involving the cooperative. In *Bookhart v. Central Elec. Power Coop.*, (1951), 219 S.C. 414, 65 S.E.2d 781, the court held that an electric cooperative is a public utility and therefore has the power of eminent domain despite the membership feature of the members being both the customers and the stockholders. The question of who bears the risk of loss for a cancelled nuclear plant is also quite distinguishable from the question of whether an electric cooperative possesses the power of eminent domain.

Second, the creditors cite statements by the Commission regarding financial responsibility of cooperative membership. The first statement is from *In re Hoosier Energy Rural Elec. Coop., Inc.* (Aug. 12, 1987 Cause No. 38315), in which the Commission stated that an electric cooperative's members "are financially responsible for all the Petitioner's managerial decisions whether good, bad or otherwise." Slip. op. at 5–6. In *Hoosier*, however, the issue was whether the cooperative could recover the costs of cancelling a long-term coal contract and the "used and useful" standard was not applicable. The second statement the creditors quote is from the interim order entered in this case in which the Commission noted the paradoxical result of applying *NIPSCO* to this case because it appears that no one is responsible for Wabash's debts. (R.Vol. IV pp. 908, 921). Despite the fact that we find the appearance deceptive in that Wabash is responsible for its debts but simply cannot pay them and, as many other debtors, may be forced into bankruptcy, the Commission's duty is to determine whether requested rate relief is proper, not to determine who is responsible for debts should the relief not be appropriate. The Commission correctly declined to

make an ultimate finding of responsibility and its statement does not provide support for the proposition that Wabash's members are ultimately responsible.

Finally, the creditors quote the following language from the *NIPSCO* Supreme Court opinion:

> In dealing with and resolving this claim, we have been unable to conceive of a situation of our own in which the consumers could be required to replenish lost capital which had never become 'used or useful' property or, in other words, be required to act in aid and support of the utility as an insurer of the investor's risk, unless consumers received an interest in return which provided an opportunity to earn a return on the capital supplied.

485 N.E.2d 610, 615. The creditors argue that because Wabash's customers are its stockholders, they receive a return on the capital they supply through rates via refunds for payments made in excess of expenses pursuant to IC 8–1–13–17(b). This argument ignores the nature of the "return" the ratepayer-stockholders[5] receive and Wabash's articles of incorporation. Wabash's ratepayer-stockholders do not receive a return on their investment in the same manner as the stockholders in an investor-owned utility. The stockholders in an investor-owned utility receive a profit on their investment through the payment of dividends. We note that Wabash's articles of incorporation provide that patrons or owners are not to furnish capital to finance utility plant or recover any profits from utility operations. Wabash's stockholders, as all stockholders in a cooperatively-owned utility, do not receive a profit but a refund of excess payments they made to cover the service they received. We do not think the Supreme Court was speaking in terms of

such refunds when it referred to "an interest in return which provided an opportunity to earn a return on the investment."

The sources cited by the creditors do not support the proposition that the ratepayers of a cooperatively-owned utility should bear the risk of loss of a cancelled nuclear facility even though the ratepayers are also the utility's stockholders. Furthermore, it should be noted that the Supreme Court did not say that the risk of loss should be borne by stockholders but that it should be borne by the investors which in the *NIPSCO* case happened to be the stockholders. *NIPSCO*, 485 N.E.2d 610, 614–15. While Wabash's ratepayers are technically its shareholders, they cannot be considered to be investors in the same manner as stockholders in an investor-owned utility. The stockholder in an investor-owned utility makes a choice as to whether to invest and to what extent to invest. The stockholders of a cooperatively-owned utility must "invest" in order to receive service and their "investment" is a set amount and is termed a membership fee. Because of the holding in *NIPSCO*, the stockholder in an investor-owned utility may be subjected to liability for the costs of a cancelled nuclear facility but only to the extent of his investment. Should we hold that *NIPSCO* is not applicable to cooperatively-owned utilities and that the costs incurred for a cancelled nuclear facility by a cooperatively-owned utility could be recovered through a rate increase, the "stockholders" of a cooperatively-owned utility would be subjected to unlimited liability. The purpose of cooperatively-owned utilities was to provide low cost electricity to rural America. *Alabama Power Co. v. Alabama Elec. Coop., Inc.* (5th Cir.1968), 394 F.2d 672, 677. It appears to be against public policy to subject ratepayers in such areas to unlimited liability.[6]

---

**5.** Throughout this discussion the term "ratepayers" refers to the customers of the twenty-four REMC's that are Wabash's stockholders because those are the persons who ultimately would bear the burden of increased rates.

**6.** The REA also argues that the Supreme Court's holding in *NIPSCO* was based upon the reasoning that investor-owned utility customers needed protection against the abuse of monopolistic

practices such as artificially high prices and that because the customers of a cooperatively-owned utility are its shareholders, such protection is unnecessary. This argument is flawed in two respects. First, the Supreme Court merely noted that the result of the used and useful standard was protection against monopolistic abuses; the holding was that under the used and useful standard a utility cannot recover costs

The second argument the creditors make regarding the inapplicability of *NIPSCO* to this case is that *NIPSCO* involved an investor-owned utility whose rates were based upon rate of return principles rather than a cooperatively-owned utility whose rates are based upon revenue requirement principles. In support of their argument, they cite IC 8-1-13-17 which partially provides that "[a] reasonable and just charge for service within the meaning of this section shall be such charges as shall produce sufficient revenue to pay all legal and other necessary expense incident to the operation of the system, to include ... interest charges on bonds or other obligations [and] to provide a sinking fund for the liquidation of bonds or other evidences of debt.... Any rate too low to meet the foregoing requirements shall be unlawful." IC 8-1-13-17 (1982 current version at Supp.1987).[7] The creditors thus argue that any rate which is set so low as to not allow a cooperatively-owned utility to pay its debts is unlawful. This argument, however, ignores the fact that, just as is the case with investor-owned utilities, rates must be based upon service.

IC 8-1-13-17 provides that "[a] reasonable and just charge for *service* ... shall be charges as shall produce sufficient revenue...." IC 8-1-13-17 (1982) (current version at Supp.1987) (emphasis supplied). " 'Service' or 'services' means the furnishing of energy, and the rendering of engineering, financial, accounting, or educational services incidental to the production, transmission, or use of energy, assisting in the establishment and maintenance of better communication between corporations and their members, or any of the same." IC 8-1-13-3(m) (1982 & Supp.1987). A fa-

cility which does not furnish energy does not provide service and thus cannot be included in a cooperative's charges to its ratepayers. Furthermore, IC 8-1-13-17 provides that "[a] reasonable and just charge for service within the meaning of this section shall be such charges as shall produce sufficient revenue to pay all legal and other necessary expense incident to the operation of its *system....*" IC 8-1-13-17 (1982) (current version at Supp.1987) (emphasis supplied). " 'System' means any plant, works, system, facilities, or properties, together with all parts thereof and appurtenances thereto, *used or useful* in the generation, production, transmission, or distribution of energy." IC 8-1-13-3(e) (1982 & Supp.1987). Marble Hill was never "used or useful in the generation, production, transmission, or distribution of energy." Debts incurred by virtue of Wabash's participation in the project therefore cannot be considered expenses incident to the operation of Wabash's system and they cannot be included in Wabash's charges to its ratepayers. The method of determining rates thus is irrelevant as to whether a utility can recover costs of a cancelled nuclear facility through rates. The statutes under which cooperatively-owned utilities operate, although based upon revenue requirement principles rather than rate of return principles, demand that a facility must be "used or useful" in the same manner that IC 8-1-2-1 and 8-1-2-4 demand that facilities owned by investor-owned utilities must be "used or useful." The difference in ratemaking methodology between cooperatively-owned and investor-owned utilities therefore does not destroy *NIPSCO's* applicability to this case.

associated with a cancelled nuclear facility by increasing its rates. Secondly, the suggestion that customers of a cooperatively-owned utility do not need protection against artificially high prices is to assume that they enjoy the benefits of a competitive market for electricity. This ignores the purpose for which such utilities were created: to provide low cost electricity to rural areas which investor-owned utilities found financially impractical to service. Cooperatively-owned utility areas therefore are not more competitive and probably are less competitive markets for electricity than the areas served by

investor-owned utilities. The customers in co-operatively-owned utility areas thus do not need less protection than those of an investor-owned facility.

7. In its brief, CFC uses the amended version of this statute in support of its argument. The amended version, however, was not in effect until September 1, 1987, approximately eight months after the Commission entered its January 28, 1987 dismissal order. The amended version has no applicability to this case.

The creditors next argue that *NIPSCO* is inapplicable to this case because Wabash received the Commission's approval to borrow funds for the Marble Hill investment. In support of this argument, they cite IC 8–1–8.5–5.5. This statute permits utilities to recover, through rates, costs associated with a cancelled facility where the Commission, after considering the risks and holding a public hearing, issues a certificate approving the construction of the facility and then later revokes or modifies the certificate. (Supp.1987). Three reasons prevent the provision from changing the result in this case. First, neither creditor raised this issue before the Commission and thus it is waived. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7). Second, this provision did not become effective until April 17, 1985, long after Wabash invested in Marble Hill.[8] Third, the requirements for the applicability of the section have not been met. The Commission approved Wabash's decision to borrow in order to invest in the project, not the project itself. The Commission did not analyze the risks of the project, hold a public hearing upon the project, or issue a certificate approving the project. The Commission did not revoke or modify a previously issued certificate which resulted in the cancellation of the project. PSI cancelled the project after determining it was financially unable to continue with it. IC 8–1–8.5–5.5 has no application to this case and does not destroy the applicability of *NIPSCO* to it.

The creditors also argue that *NIPSCO* is not applicable to this case because *NIPSCO* did not involve an insolvent utility as is the situation in this case. The creditors, however, do not cite any authority which supports the proposition that a utility can recover the costs of a cancelled nuclear plant through rates when the utility faces insolvency. Admittedly, insolvency was a concern expressed by Justice Givan in his dissent in *NIPSCO*, 485 N.E.2d 610, 620,

but that only serves to underscore the fact that the majority was aware of the problem and chose to ignore it as not germane to its determination. The majority did not condition its reasoning upon the fact that NIPSCO was solvent when it requested rate relief. We consider the majority's lack of reference to solvency as an indication that the financial condition of a utility is not of substantial significance in resolving the question of whether costs incurred by participation in a cancelled facility may be recovered by increasing rates to the consumer. The creditors' argument has also been specifically rejected by the New Hampshire Supreme Court. *See Petition of Pub. Serv. Co. of N.H.* (1988), 130 N.H. 265, 539 A.2d 263.

The creditors also cite two Indiana Commission cases in support of their insolvency argument. *Public Serv. Comm. of Ind.* (March 7, 1986 Cause No. 37414) 72 P.U. R.4th 660; *In re NIPSCO* (July 15, 1987 Cause No. 38045), 85 P.U.R.4th 605. These cases, however, stand for exactly the opposite proposition than that suggested by the creditors. In both cases, the Commission granted the requested rate relief in order for the utility to avoid insolvency, but the result was reached with the specific exclusion of costs from the cancelled facilities from the rate base. Although one of the commissioners in *Public Serv. Comm.* acknowledged that the rate relief was required because of the cancellation of a nuclear facility, he did so in a concurring opinion. *Id.* (Comm. O'Lessker, concurring). The rate relief may have been required due to the cancellation of the project but the majority made it very clear that the costs of the project were not going to be recovered through the rate increase.[9] The majority in *In re NIPSCO* also made it very clear that the costs of Bailly N–1 were excluded from their calculations in grant-

---

**8.** The statute was in effect when *NIPSCO* was decided by the Supreme Court and played no part in the court's opinion.

**9.** Specifically, the effects of a current income tax deduction for the cancelled facility along with the associated interest expense deduction

were allocated to the investors for current rate-making purposes because the investors were responsible for the costs of the project and would never recover the costs from the utility's ratepayers.

ing relief.[10]

The REA's last argument on the application of *NIPSCO* to this case is that to apply that decision to cooperatively-owned utilities is contrary to the historical basis upon which such utilities were established, the providing of low cost electricity to rural areas.[11] In support of its argument, the REA notes that the REA administrator may refuse to grant future loans and guarantees to Indiana cooperatives which would result in the reduction in the availability of low cost electricity in Indiana. The REA administrator knew or should have known that the security for the loan he approved for Wabash was its all requirements contracts with its members and that those contracts provided that Wabash's members would pay rates that were approved by the Commission. Our Supreme Court's opinion in *NIPSCO* and statutory authority pertaining to cooperatives prevent rates from including the costs of facilities that were never used or useful. This court cannot ignore statutory authority and our Supreme Court's opinion on the issue in order to avoid threatened future sanctions by a federal agency. Furthermore, it should be noted that IC 8–1–8.5–5.5, although not in effect when the facts relevant to this case occurred, may prevent similar situations from occurring in the future. The REA administrator thus will have greater security for loans made to Indiana cooperatives than he has had in the past.

The REA cites *Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm.* (1983), 461 U.S. 375, 389, 103 S.Ct. 1905, 1915, 76 L.Ed.2d 1 for the proposition that a rate set by a state regulatory commission may so seriously compromise the ability of a wholesale cooperative to repay its federal loans as to be implicitly pre-empted by the Rural Electrification Act. While there is language in that opinion to that effect, the REA admits that the question of pre-emption is not actually before this court. This

court may only address the issues which are actually placed before it for consideration. Appellate Rules 8.3(A)(3) and 8.3(A)(7). We do note, however, that in *Jersey Cent. Power & Light Co. v. F.E.R.C.*, (D.C.Cir.1987), 810 F.2d 1168, the Federal Energy Regulation Commission refused rate relief because the property was not used or useful. Although the Commission was reversed in *Jersey Cent.*, 810 F.2d 1168, the reversal has been interpreted to have been due to the Commission's failure to grant the utility a hearing on the matter rather than as giving utilities an absolute right to avoid bankruptcy. *See Petition of Pub. Serv. Co. of N.H.* (1988), 130 N.H. 265, 539 A.2d 263.

■ The creditors also assert that the Commission erred in failing to consider whether Wabash was entitled to emergency rate relief under IC 8–1–2–113. No petition for emergency rate relief under that provision, however, was before the Commission. Wabash did not file a supplemental petition even though it had requested leave to do so. This court is a court of review and does not consider issues on appeal that were never before, and therefore were never ruled upon by, the administrative body. IC 8–1–3–7 (1982); Appellate Rule 4(C). Furthermore, at least one other state has refused to grant emergency relief where the request was based upon a facility which was never used or useful thereby not entitling the utility to regular rate relief. *See Petition of Pub. Serv. Co. of N.H.* (1988), 130 N.H. 265, 539 A.2d 263 (in light of the source of the emergency, cashflow ratemaking would simply be an effort to accomplish indirectly what the terms of the used and useful law prohibit directly).

The last contention made by CFC is that the Commission's order denies Wabash's constitutional right not to have property taken without just compensation. This contention was not raised before the Com-

---

**10.** The Commission did permit depreciation on a facility that had been excluded from the rate base as excess capacity to be included as an operating expense where the facility was being used by the utility for operating cost savings. Additionally, the Commission increased the util-

ity's common equity by 2% over that of the industry because of its unique risks.

**11.** A fifty-one percent rate increase also does not appear to be consistent with the policy of providing low-cost electricity.

mission. It has therefore been waived. *Allen v. Beneficial Finance Co. of Gary, Inc.* (7th Cir.1976), 531 F.2d 797, *cert. denied* 429 U.S. 885, 97 S.Ct. 237, 50 L.Ed.2d 166; *Linville v. Shelby Co. Plan Comm.* (1972), 258 Ind. 467, 281 N.E.2d 884. (We additionally express grave doubt as to the creditors' standing to raise such an issue. *See, e.g., Randall v. State* (1983), Ind., 455 N.E.2d 916, 920; *Josam Mfg. Co. v. Ross* (1981), Ind.App., 428 N.E.2d 74.)

Even if the issue had been raised by Wabash, however, at least two courts from other jurisdictions have rejected the argument that a "used or useful" standard for utility rates violates the constitutional guarantee against the taking of property without just compensation. *Petition of Pub. Serv. Co. of N.H.* (1988), 130 N.H. 265, 539 A.2d 263; *Barasch v. Pennsylvania Pub. Utility Comm.* (1987), 516 Pa. 142, 532 A.2d 325. In rejecting the argument the New Hampshire Supreme Court stated the following in regard to the case relied upon by CFC:

> At this juncture, we point out that a case much relied upon ... *Jersey Cent. Power & Light Co. v. Federal Energy Regulatory Comm'n.,* 810 F.2d 1168 (D.C.Cir.1987) *(Jersey Central)*, is not as helpful to the company's position as might appear on a first reading. In *Jersey Central,* the utility sought relief from a Federal Energy Regulation Commission (FERC) order modifying the utility's proposed rate schedule. The utility charged 'that it alleged facts which, if proven, show that the reduced rates are confiscatory and violate its statutory and constitutional rights as defined by the Supreme Court in *Hope....*[12]
>
> *Jersey Central's* teachings are simple. First, the utility was impermissibly denied a hearing to make its case and to distinguish its situation from other instances in which FERC had excluded unamortized investment in cancelled plants from rate base, upon which FERC based its precedential foundation for summarily disposing of Jersey Central's request. The second teaching of *Jersey Central* is that 'the end result of commission rate orders must be "just and reasonable" to both consumers and investors, and that, in achieving this balance, the commission must consider the impact of its rate orders on the financial integrity of the utility.' *Id. Jersey Central* does not stand for the proposition ... that a publicly regulated utility has a constitutional right not to go bankrupt.... *Jersey Central* is not dispositive of this case.

*Petition of Pub. Serv. Co. of N.H.* (1988), 130 N.H. 265, 539 A.2d 263.

We realize that Wabash is in serious financial difficulty as evidenced by its petition for bankruptcy under Chapter Eleven. We, however, have not located any cases which hold that a public utility cannot go bankrupt. The REA and CFC, as creditors similarly situated to other creditors whose debtors file for bankruptcy, will have their rights adjudicated by the bankruptcy court. They are not constitutionally protected from the results of such a proceeding.

The Commission had jurisdiction of Wabash's petition and did not enter an advisory opinion or a declaratory judgment. The Commission did not abuse its discretion by dismissing the petition on its merits rather than for failure to prosecute. A cooperatively-owned utility may not recover the costs of its participation in a facility which has never been used or useful unless IC 8–1–8.5–5.5 applies, and in this case it did not. A utility's insolvency does not eliminate the used or useful standard nor does the historical basis upon which rural elec-

---

**12.** In *Federal Power Comm. v. Hope Natural Gas* (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the U.S. Supreme Court held that in determining just and reasonable rates the Commission must balance the interest of the investor against that of the consumer. In regards to the investor's interest, the Court stated:

> '[I]t is important that there be enough revenue not only for operating expenses but also for capital costs of the business. These in-

clude service on the debt.... By that standard, the return ... should be sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract capital.'

*Id.* at 603, 64 S.Ct. at 288. This statement merely defines the investor's interest. It does not provide, as the creditors imply, constitutional protection from a utility filing for bankruptcy.

tric cooperatives were founded. The constitutionality of an order denying rate relief for losses incurred concerning property that is not used or useful in providing service on the basis that the order violates the utility's right against the taking of property without just compensation is not properly before the court. The Commission properly denied Wabash's petition for a rate increase.

AFFIRMED.

SHIELDS, P.J., and STATON, J., concur.