**WABASH VALLEY POWER ASSOCIATION, INC., an Indiana not-for-profit corporation, Plaintiff,**

v.

**RURAL ELECTRIFICATION ADMINISTRATION, Defendant.**

**No. IP–90–1858–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 19, 1991.

---

Don F. Morton, Wabash Valley Power Ass'n, Larry J. Wallace, Parr, Richey,

Obremskey & Morton, David H. Kleiman, Dann, Pecar, Newman, Talesnick & Kleiman, Indianapolis, Ind., Lee A. Freeman, Jr., John F. Kinney, James T. Malysiak, Freeman, Freeman & Salzman, Chicago, Ill., for plaintiff.

J. Christopher Kohn, James G. Bruen, John T. Stemplewicz, Asst. Attys. Gen., Civ. Div., Dept. of Justice, Washington, D.C., Deborah J. Daniels, U.S. Atty., Jeffrey L. Hunter, Gerald A. Coraz, Asst. U.S. Attys., Indianapolis, Ind., Michael W. Kelly, Frank Clover, Office of Gen. Counsel, Dept. of Agriculture, Washington, D.C., for defendant.

### ENTRY

DILLIN, District Judge.

This matter comes before the Court on cross-motions for summary judgment, on the defendant's motion to stay the proceedings, and on three non-parties' motions to intervene as party-plaintiffs. For the reasons set forth below, the Court grants the plaintiff's motion for summary judgment, and denies the defendant's cross-motion for summary judgment, the defendant's motion to stay and the three motions to intervene.

#### Background

Today the Court revisits the Rural Electrification Administration's (REA's) struggle to recoup some half a billion dollars outstanding of a total of one billion dollars owed to it by Wabash Valley Power Association, Inc. (Wabash). The facts material to the claims before the Court are not in dispute. Because they have been thoroughly described in the prior proceedings, they will be only briefly summarized here. *See Wabash Valley Power Ass'n v. Rural Electrification Administration*, 903 F.2d 445 (7th Cir.1990) (*Wabash IB*); *Wabash Valley Power Assoc. v. Rural Electrification Admin.*, 713 F.Supp. 1260 (S.D.Ind. 1989) (*Wabash IA*), *aff'd*, 903 F.2d 445 (7th Cir.1990).

Wabash is a non-profit generation-and-transmission electric cooperative that pro-

duces and supplies wholesale electricity. Its customer-owners operate in three states, including Indiana. REA is a federal agency established in 1935 to bring electric power to rural America, which it does by making, insuring and guaranteeing loans to rural electric cooperatives. In Wabash's case, REA executed guarantees so that Wabash could obtain loans with which to purchase a seventeen percent interest in the Marble Hill nuclear power generation station, being built by the for-profit Public Service Company of Indiana (PSI).

The trouble that has caused so much litigation involving the present parties began when PSI abandoned construction of Marble Hill, in January, 1984. Wabash lost the borrowed money it had invested, defaulted on the loans, and eventually, in May of 1985, filed for bankruptcy. Meanwhile, REA, as guarantor, had to pay back the loans in Wabash's stead. It instructed Wabash, in accordance with the contract between them, to petition for rate increases sufficient to ensure repayment to REA. Wabash did so, in April of 1984, but the Indiana Public Service Commission, now called the Indiana Utility Regulatory Commission, (the Indiana Commission) dismissed the petition. *In re Wabash Valley Power Association, Inc.*, 82 PUR 4th 18 No. 37472 (Ind.Pub.Serv.Comm'n Jan. 28, 1987). On appeal, the state courts affirmed the Indiana Commission's dismissal by extending the "used-or-useful" rule to customer-owned utilities. *National Rural Util. Co-op. Fin. Corp. v. Public Serv. Comm'n of Indiana*, 528 N.E.2d 95 (Ind. Ct.App.1988), *aff'd*, 552 N.E.2d 23 (Ind. 1990). Under this rule, a utility cannot raise its rates to recover the costs of failed construction or of other expenses not "*used or useful* in the generation, production, transmission, or distribution of energy." 528 N.E.2d at 102 (quoting Ind.Code § 8–1–13–3(e)).

A second round of litigation began when REA attempted, shortly after the Indiana Court of Appeals issued its decision, to force a rate increase by writing a letter to Wabash informing it that REA was preempting the Indiana Commission's jurisdiction and requiring Wabash to raise its

rates by nine percent. Wabash filed suit in this Court, seeking a declaratory judgment that REA had no such authority. We granted summary judgment in Wabash's favor, *Wabash IA*, 713 F.Supp. 1260, and the Seventh Circuit affirmed. *Wabash IB*, 903 F.2d 445. The Seventh Circuit held, *inter alia*, that even if REA had statutory authority to preempt state regulation of Wabash's ratemaking, it could not do so by writing a letter and ignoring the formalities of rulemaking required by the Administrative Procedure Act (APA), 5 U.S.C. § 553.

Subsequently, REA did go through the formal rulemaking process set out in the APA, and, after allowing for notice and comment, adopted two new regulations (the preemptive regulations). The first provides, in principal part:

> (a) State regulatory authority jurisdiction over a power supply borrower's rates shall be preempted by the R[ural] E[lectrification] Act if the Administrator shall have determined that the borrower's rates approved by the state regulatory authority are, after taking into account the borrower's costs and expenses, inadequate to produce revenues sufficient to permit the borrower to make required payments on its secured loans and the borrower has failed to make required payments on its secured loans.

7 C.F.R. § 1717.305 (1991). The second provides:

> State Regulatory Authority jurisdiction over an REA borrower's rates shall be pre-empted by the RE Act and REA shall have exclusive jurisdiction over the borrower's rates:
>
> (a) On October 19, 1990, with respect to any borrower by or against whom a case under the Bankruptcy Code of 1978, as amended, was commenced prior to and remains outstanding on October 19, 1990; and
>
> (b) With respect to all other borrowers, upon the filing of a petition by or against the borrower commencing a case

under the Bankruptcy Code of 1978, as amended.

7 C.F.R. § 1717.354 (1991).

Wabash then filed the present action and thereby initiated yet another round of litigation concerning the Marble Hill failure. This time, Wabash seeks a declaratory judgment that the preemptive regulations are invalid. It seeks summary judgment on one or more of the following grounds: 1) Congress has given REA no authority to preempt state rate regulation; 2) the preemptive regulations cannot be applied retroactively to change the law applicable to Wabash's loan guarantees, which were entered into before the regulations were adopted; 3) REA made a contractual commitment to allow state regulation of Wabash's rates and cannot abrogate that commitment by regulation; 4) REA lacks authority to amend the Bankruptcy Code administratively to create a preference for REA; and 5) the preemptive regulations violate the automatic stay provision of the Bankruptcy Code.

REA filed a counterclaim against Wabash in which it seeks enforcement of the preemptive regulations. After the summary judgment motions were fully briefed, REA filed a motion to stay these proceedings until the bankruptcy court had ruled on its motions in that court to appoint a trustee or an examiner. Since then, the bankruptcy court has confirmed Wabash's proposed plan of reorganization, under which about 65% of Wabash's pre-petition debt to REA is to be repaid, and denied confirmation of REA's plan, which would have required repayment in full. *In re Wabash Valley Power Association, Inc.*, No. 85–2238–RWV–11 (Bankr.S.D.Ind. Aug. 7, 1991).

Three non-parties have filed motions to intervene as party-plaintiffs and in support of Wabash's motion for summary judgment. One of these was filed by the Indiana Office of Utility Consumer Counselor, another by the National Association of Regulatory Utility Commissioners, and the third by the Indiana Utility Regulatory Commission.

Finally, the National Rural Electric Cooperative Association (NRECA) has filed an *amicus curiae* brief in support of the defendant's position on the summary judgment motions.

### Discussion

The bankruptcy court's confirmation of Wabash's reorganization plan has apparently mooted REA's motion in this Court to stay the proceedings. In any case, the summary judgment motions have been fully briefed for more than seven months and the Court finds no just reason for delaying a ruling on them. Accordingly, REA's motion to stay is denied as moot or, in the alternative, on the merits.

The court may grant summary judgment only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). Because the material facts are not in dispute, and because both parties have moved for summary judgment, the Court need only consider which of the parties is entitled to judgment as a matter of law.

The Court begins and ends its analysis with the question whether the preemptive regulations lawfully preempt the Indiana Commission's ratemaking authority over Wabash. Preemption of state regulation usually takes one of three forms. "Express preemption" arises when Congress or a federal agency has stated in express terms its intention to preempt state regulation in a given area. "Implied preemption" arises when Congress has regulated so pervasively or has regulated in a field in which federal interests are so dominant that it has impliedly displaced state regulation by occupying the field. Finally, "conflict preemption" arises when Congress did not necessarily intend to preclude all state regulation in a given area but a particular state regulation conflicts directly with a federal law, so that compliance with both is impossible, or stands as an obstacle to the accomplishment of federal objectives. *Pacific Gas & Elec. Co. v. State*

*Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752, 765 (1983).

 Some of the preemption arguments that might be made in this case are foreclosed either by the doctrine of claim preclusion or by precedent. Claim preclusion bars REA from arguing that federal law (other than any that REA attempted to create after the initiation of the state administrative proceedings) requires an increase in Wabash's rates. This is because, as this Court and the Seventh Circuit previously held, REA relied only on state law in the administrative and state court proceedings. *Wabash IB,* 903 F.2d at 455–56; *Wabash IA,* 713 F.Supp. at 1267–69. Nonetheless, REA argues in the present case that the state rates are implicitly preempted by the supremacy clause under "conflict preemption" analysis and that they are prohibited by negative implications from the commerce clause. As in *Wabash IA* and *Wabash IB,* the Court finds that REA is barred from making such arguments in the present case. Moreover, the Supreme Court, in *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), held that the Rural Electrification Act (RE Act), 7 U.S.C. §§ 901 *et seq.,* neither expressly preempts all state rate regulation nor impliedly preempts it by occupying the field. *Arkansas* left open, however, the questions whether a particular state rate might be preempted under conflict preemption analysis and whether REA has the authority, delegated from Congress, expressly to preempt state ratemaking. Because REA is precluded from raising conflict preemption, and because the Supreme Court has held that the RE Act does not impliedly occupy the field, the only preemption issue for the court to decide is whether REA's attempt to preempt state ratemaking expressly by promulgating the preemptive regulations is legitimate.

 Wabash contends that REA's attempt is not legitimate because express preemption of state ratemaking is not one of the powers delegated by Congress to REA. In other words, Wabash claims that

the preemptive regulations are invalid because they are, in the language of the APA, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). We agree.

In *Wabash IA,* this Court reviewed REA's authority for its position that it has the power expressly to preempt state ratemaking. That authority consisted of "snippets of legislative history of the Rural Electrification Act and a 1967 Federal Power Commission ruling, *Dairyland Power Cooperative,* 37 F.P.C. 12 (1967)." *Wabash IA,* 713 F.Supp. at 1268. Based on the Supreme Court's interpretation of the legislative history of the RE Act in *Arkansas,* and on our finding that "whatever the FPC had to say in *Dairyland* dicta about REA ratemaking authority has been implicitly but clearly superseded by ... *Arkansas,*" *Wabash IA,* 713 F.Supp. at 1266, we concluded that "REA does not have wholesale ratemaking jurisdiction over rural electric cooperatives regulated by state utility commissions." *Id.*

Similarly, the Seventh Circuit, while finding it unnecessary to decide whether REA has the authority to adopt a general system of regulation preempting state ratemaking, nonetheless hinted strongly in dicta that no such authority exists. It stated:

There is, moreover, substantial doubt about whether a rule preempting state regulation would be "valid under the Rural Electrification Act". [*Arkansas,* 461 U.S. at 389, 103 S.Ct. at 1915, 76 L.Ed.2d at 13.] Neither REA's letter to Wabash nor its brief in this court cites any provision of the statute allowing it to regulate the rates charged by its borrowers. Unless the REA has this authority, it is hard to see how it can preempt state law, given the holding of *Arkansas* that federal law does not occupy the field. REA needs a source of authority to set up a system making demands inconsistent with those of state law, so that under the Supremacy Clause the federal obligation would prevail.

Congress' assumption when it created the [RE] Act in 1936 seems to have been

that the REA could protect itself by setting conditions on the extension of credit.... The REA may refuse to make loans unless state agencies guarantee rates high enough to allow repayment. It may refuse to approve a loan unless the customers (whose promises to buy power are the real security for the debt) guarantee the loan or authorize the REA to dictate rates. If either state or customer balks, the REA may deploy its funds elsewhere. Since Indiana's adoption of the used-and-useful standard, the REA has refused to make or guarantee new loans to co-ops in that state. The conditioning power is a big club, which can achieve (effective) preemption and more. But REA did not use this power when extending credit. It approved contracts with Wabash's customers that oblige them to pay no more than the state rate; it did not secure guarantees.
*Wabash IB*, 903 F.2d at 453 (citation omitted).

REA insists that it has the authority to preempt state ratemaking expressly. Its first argument is: Since this Court and the Seventh Circuit have admitted that a particular state rate might so conflict with federal objectives as to be impliedly preempted, surely REA has the authority expressly to preempt particular state rates that would be impliedly preempted anyway, even though the implied preemption argument is precluded by REA's failure to raise it earlier.

The Court rejects this argument for several reasons. First, it is not clear that state regulation of Wabash's rates would be impliedly preempted in this case even if the Court reached that issue. The Seventh Circuit did not decide, but clearly doubted, "whether REA is entitled to a federal rule that protects agencies that did not protect themselves. (More realistically, a rule that protects the Treasury from federal employees who neglected to take precautions and private parties who take advantage of their omissions.)" *Wabash IB*, 903 F.2d at 455. Second, REA's regulations sweep much more broadly than would a finding that the particular state rate approved for Wabash

by the Indiana Commission is impliedly preempted. Third, as this Court pointed out when REA attempted to achieve the same result by letter, rather than by regulation, "[n]othing in the Rural Electrification Act gives REA the power unilaterally to make a determination of implied preemption and, by administrative fiat, usurp state ratemaking authority and dictate a rural electric cooperative's wholesale rates." *Wabash IA*, 713 F.Supp. at 1270. We went on to say that when the REA believes that a state rate decision is impliedly preempted, its proper recourse is to "challenge the decision through established state appeals procedures." *Id.*

REA also argues that various cases, interpreting statutory provisions not at issue in the present case, support its position. It contends that the Court should interpret the RE Act by analogy with the National Housing Act (NHA), 12 U.S.C. § 1701 *et seq.*, which courts have found allows HUD to preempt state rent control regulation. *See, e.g., City of Boston v. Harris*, 619 F.2d 87 (1st Cir.1980). The NHA, however, is easily distinguishable from the RE Act in that the NHA specifically grants HUD authority to control rents, *see, e.g.*, NHA, 12 U.S.C. § 17151(d)(3), whereas the RE Act does not specifically give REA the authority to control rates. Similarly, the other cases REA cites, while they, at least, interpret the same statute that is before the Court in the present case, all involve agency conduct that was specifically authorized by sections of the RE Act not triggered in this case.

■ REA, while admitting that the cases it cites all involve express congressional authorization of an administrative agency's conduct, contends that this is no basis for distinguishing the cases, because express congressional authorization is not required to make preemption lawful. REA finds support for its position in a Supreme Court case that states:

> [T]he inquiry [is] whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power. Thus we have em-

phasized that in a situation where state law is claimed to be pre-empted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action.... Where [an agency has a broad grant of authority to reconcile conflicting policies], the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*City of New York v. Federal Communications Comm'n*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988) (citations omitted). While this Court agrees that express congressional authorization is not necessary to make lawful an agency's express preemption of state regulation, the agency must, nonetheless, have *some* "source of authority," *Wabash IB*, 903 F.2d at 453, such that its choice to preempt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642, 100 L.Ed.2d at 57. The cases REA cites are inapposite because in them the source of authority was the enabling statute itself.

REA argues that the legislative history reveals that REA's power to preempt is implicit in the RE Act, which, therefore, according to REA, provides REA's source of preemptive authority. That same legislative history, however, was reviewed by this Court in *Wabash IA* and by the Seventh Circuit in *Wabash IB*, where it was interpreted as denying such authority. Nothing that REA or NRECA as *amicus curiae* has said in their briefs in the present case persuades the Court to change

its own prior conclusion or to disagree with the Seventh Circuit's clearly expressed view that the legislative history of the RE Act shows that Congress intended not to vest REA with the authority to preempt state ratemaking expressly.

In summary, the Court finds that the REA preemptive regulations are invalid because they were promulgated in excess of REA's statutory authority. Having so found, the Court does not address any of the other arguments raised by Wabash in support of its motion. Furthermore, this ruling in favor of Wabash has rendered moot the three motions to intervene. Accordingly, they are denied.

### Conclusion

For the reasons set forth above, the Court denies REA's motion to stay as moot or, in the alternative, on the merits, denies as moot the three motions to intervene, and, finding that there are no genuine issues of material fact and that Wabash is entitled to judgment as a matter of law, the Court grants the plaintiff's motion for summary judgment, denies the defendant's cross-motion for summary judgment, and enters a declaratory judgment that the REA regulations codified at 7 C.F.R. § 1717.305 (1991) and at 7 C.F.R. § 1717.-354 (1991) are unlawful and may not be enforced against Wabash.