NATIONAL RURAL UTILITIES COOP-
ERATIVE FINANCE
CORPORATION, Appellant,

v.

PUBLIC SERVICE COMMISSION OF
INDIANA, Wabash Valley Power Asso-
ciation, Inc., Office of the Utility Con-
sumer Counselor, City of Fort Wayne,
Indiana, Public Service Company of
Indiana, Inc., Fruit Belt Electric Coop-
erative, Jay County REMC, United
REMC, Warren County REMC, Boone
County REMC, Kankakee Valley
REMC, and United States of America
on Behalf of Its Rural Electrification
Administration, Department of Agricul-
ture, Appellees.

UNITED STATES of America,
Appellant,

v.

PUBLIC SERVICE COMMISSION OF
INDIANA, et al.

No. 93S02–9003–EX–215.

Supreme Court of Indiana.

March 21, 1990.

Power Systems Engineering, Ham Lake, Mich., James R. McClarnon, Michael B. Cracraft, Hackman, McClarnon & McTurnan, and Thomas D. Titsworth, Bamberger & Feibleman, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., for appellee.

John Coldren, Coldren & Frantz, Portland, Albert Ernst and Jon R. Robinson, Dykema, Gossett, Spencer, Goodnow & Trigg, Lansing, Mich., for Fruit Belt Elec. Co-op., Warren County REMC, United REMC, Boone County REMC, and Jay County REMC.

Robert L. Thompson, P.C., Fort Wayne, for City of Fort Wayne, Ind.

Dujean C. Garrett, Greg K. Kimberlin, Public Service Co. of Indiana, Plainfield, and Jerry P. Belknap, Barnes & Thornburg, Indianapolis, for Public Service Co. of Indiana.

Don F. Morton and Carol Sparks, Parr, Richely, Obremskey & Morton, and Wabash Valley Power Ass'n, Inc., Indianapolis, for Wabash Valley Power Ass'n, Inc.

DeBRULER, Justice.

Appellants here are the Rural Electrification Administration of the United States government (REA) and National Rural Utilities Cooperative Finance Corporation (CFC), lenders who advanced funds to the Wabash Valley Power Association (Wabash) to be used toward the completion of the Marble Hill nuclear power generation plant, a joint enterprise Wabash had undertaken in conjunction with Public Service Company of Indiana. Following the abandonment of construction at Marble Hill, Wabash filed a petition with the Public Service Commission of Indiana (now the Indiana Regulatory Commission) for a fifty-one percent rate increase intended to generate funds to pay project-related debts. The commission dismissed Wabash's petition with prejudice, noting that under this Court's holding in *Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610

Thomas E. Kieper and Jan Helpert, Office of Utility Consumer Counselor, Indianapolis, for Office of Utility Consumer Counselor.

William M. Evans, Bose, McKinney & Evans, Indianapolis, for Kankakee Valley REMC.

Leo Clifford, Clifford, Clauden & Alea, Valparaiso, for appellee.

Alan Kornberg, Milbank, Tweed, Hadley & McCloy, New York City, Fred E. Schlegel, Michael J. Huston, Mary M. Stanley, Baker & Daniels, Citizens Action Coalition, Indianapolis, Dennis Eicher, Vice President,

(*NIPSCO*),[1] a utility may not recover sunk costs associated with the cancellation of a nuclear power project through a rate increase. The Court of Appeals affirmed the commission's decision, fully addressing the issues raised by REA and CFC in their appeal. *National Rural Utils. Coop. Fin. Corp. v. Public Serv. Comm'n* (1988), Ind. App., 528 N.E.2d 95. We grant the petitions for transfer and affirm pursuant to Indiana Rule of Appellate Procedure 11(B)(3). A brief summary of the resolution of the issues raised on appeal follows.

I. *The commission acted within its jurisdiction when it entered its order since the order constituted neither an advisory opinion nor a declaratory judgment.*

## A.

■ REA argued that because Wabash did not strongly support its petition for a rate increase, there was no case or controversy before the commission and that the resulting order was therefore merely an advisory opinion, which the commission had no jurisdiction to enter. Jurisdiction requires an actual, existing justiciable controversy between adverse parties. One aspect of adverseness is the propriety and ability of one of the parties to call upon the tribunal to adjudicate its cause. Because all rate increases must be approved by the commission, it had primary jurisdiction to hear the petition, and as the entity seeking the increase, Wabash was the proper party to invoke the commission's jurisdiction. The validity and desirability of the proposed rate increase, which would have had an immediate and substantial impact on Wabash, its ratepayers, and its creditors, was vigorously contested by adversarial, interested parties and intervenors. The commission's order was a ruling on a live case or controversy and not an advisory opinion.

## B.

■ REA argued that the commission exceeded its jurisdiction by issuing what amounted to a declaratory judgment. The commission's duty is to enter orders based on impartial findings of fact, and the commission is not empowered to enter declaratory judgments. REA contended that because no factual record existed as to whether Wabash was entitled to emergency rate relief, the commission had issued a premature legal opinion, i.e., an impermissible declaratory judgment. However, these parties appeared before the commission to contest the merits of a proposed rate increase, not to have their rights, status, and relations determined. The commission's order was a ruling on a pending petition, and the commission was not stripped of its jurisdiction because this ruling was based on the legal conclusion that *NIPSCO* controlled the outcome of the controversy at hand nor because the rights of Wabash's creditors would be affected by its decision.

II. *The commission did not abuse its discretion by dismissing Wabash's petition on the merits rather than for lack of prosecution.*

■ REA and CFC argued that since Wabash's petition could have been dismissed procedurally for failure to prosecute under 170 I.A.C. 1–1–21, the commission committed error when it dismissed the petition on its merits. The cited provision gives the commission the discretion to dismiss a petition for failure to prosecute if there has been no activity on the petition for six months and after notice has been given to the parties that the dismissal will occur. Wabash requested and was granted a stay in the proceedings pending the decision of this Court in *NIPSCO*. The commission did not exercise its discretion to dismiss for failure to prosecute and did not

---

**1.** NIPSCO has twice appealed unsuccessfully from orders subsequently entered in that cause. The resolution of the latest appeal appears in *Northern Indiana Public Service Co. v. Citizens Action Coalition of Indiana, Inc.* (1989), Ind., 548 N.E.2d 153. That decision, which reaffirms our original holding that a utility cannot recover sunk costs associated with a failed nuclear facility through a rate increase and which clarifies the entitlement of ratepayers to interest on refunds and to attorneys' fees, does not affect the reasoning nor the validity of the Court of Appeals' decision in this case and will not be further cited in this opinion.

give the requisite notice of dismissal. In light of Wabash's request and the determinative impact that *NIPSCO* had on the case at hand, the commission did not err in dismissing Wabash's petition on its merits.

III. *The commission did not err in concluding that Wabash was not entitled to the rate relief it requested.*

This Court held in *NIPSCO* that an investor-owned utility cannot implement a rate increase to recover costs associated with a facility which was never used or useful in the production of energy. This holding is applicable to and determinative of the issue at hand, appellants' efforts to distinguish their situation from that in *NIPSCO* notwithstanding.

## A.

REA and CFC sought to distinguish this case from *NIPSCO* on the basis that the ratepayers here were the owners, and therefore the risk-bearers, of the utility. In *NIPSCO*, the utility was investor-owned, and the ratepayers were simply customers paying for service, not investors seeking returns. Appellants contend that, as members of a cooperative association, the ratepayers here were not merely customers, but had invested in the utility and were therefore subject to the risk of loss inherent in any investment activity.

In support of their view, appellants advanced as persuasive authority case law from other jurisdictions in which the courts stated that members of electrical cooperatives were both customers and stockholders of the utility. However, the question presented here, who must bear the risk of loss for a cancelled nuclear power project, is clearly distinguishable from the issues presented in those cases, whether cooperative members are competent to sit on a jury in a trial where the utility is one of the parties and whether a utility has the power of eminent domain. The cases cited by appellants have no applicability, and therefore no persuasive effect, here.

Appellants also advanced a statement made by the commission in an unrelated case, *In re Hoosier Energy Rural Elec.*

*Coop., Inc.* (August 12, 1987 Cause No. 38315), and a quotation from an interim order issued by the commission in this case as evidence that the Wabash ratepayers were investors and should be held subject to risk of loss for the failed Marble Hill project. In *Hoosier Energy*, the commission discussed the financial responsibility of cooperative membership, but the resolution of the case turned on principles unrelated to the "used and useful" standard and is wholly inapplicable here. In an interim order issued in this case, the commission noted that the application of *NIPSCO* to the facts at hand would have the apparent result that no one would be responsible for the debts incurred by Wabash. Wabash, of course, remains responsible for its debts; the question becomes whether it will be able to pay or be forced into bankruptcy like other insolvent debtors, a question which the commission could not, and did not, decide. The commission's powers and duties are to determine the propriety of requested rate increases, not to allocate the responsibility for payment of a utility's debts, and the commission appropriately refrained from issuing a finding that would purport to fix that responsibility. The comment from the commission's interim order cited by appellants provides no basis for imposing on Wabash's ratepayers the obligation to repay Wabash's debts.

The appellants argued that language from *NIPSCO* which shielded the ratepayers in that case from liability for the failed Bailly N–1 project at issue there provided a basis for subjecting Wabash's ratepayers to liability for the failed Marble Hill project here. We stated in *NIPSCO* that it was inconceivable that

> consumers could be required to replenish lost capital which had never become "used or useful" property or, in other words, be required to act in aid and support of the utility as an insurer of the investor's risk, unless consumers received an interest in return which provided an opportunity to earn a return on the capital supplied.

*NIPSCO*, 485 N.E.2d at 615. The risk of loss for a utility's nuclear power genera-

tion project is to be borne by its investors to the extent of their investment. · The *NIPSCO* ratepayers were insulated from liability for the Bailly N–1 debts because they were purely consumers of the utility. Appellants contended that the Wabash ratepayers were not purely consumers, but were investors who received "an interest ... which provided an opportunity to earn a return on the capital supplied" for monies paid into the cooperative and who were subject to risk of loss on their investment.

Cooperatively-owned utilities were created to provide low cost electricity to rural areas which investor-owned utilities found impracticable to service. Stockholders in such a utility are required to "invest" a set amount, termed a membership fee, in order to receive service, and they are refunded any payments made in excess of the charge for service actually received. Appellants made the incorrect assertion that this return of overpayment is the same as a return on an investment, thereby making the cooperative members investors in the utility. The refund of an overcharge is in no way analogous to the payment of a dividend. Further, unlike the stockholder in an investor-owned utility, these "investors" have no choice as to whether or how much to invest, and the terms of Wabash's articles of incorporation provide that patrons or owners are not to furnish capital to finance utility plants nor are they to recover profits from utility operations, thus precluding meaningful participation in the utility as investors. Finally, allowing a cooperatively-owned utility to generate funds to repay debts incurred in pursuit of a failed nuclear power plant by way of a rate increase would produce the intolerable result of subjecting its "stockholders" to unlimited liability for investment decisions into which they had no input and from which they had no recourse in the marketplace.

Case law from other jurisdictions, statements by the commission in this and other cases, and the language of this Court in *NIPSCO* provide no basis for appellants'

assertion that our holding from *NIPSCO* is inapplicable to the controversy at hand.

### B.

■ Appellants next contended that differences in ratemaking methodology between investor-owned and cooperatively-owned utilities [2] precluded the application of *NIPSCO* to this case and cited I.C. 8–1–13–17 in support of this proposition. That section, as in effect at the time of the commission's order,[3] provided in pertinent part:

> A reasonable and just charge for service ... shall be such charges as shall produce sufficient revenue to pay all legal and other necessary expense incident to the operation of the system, to include ... interest charges on bonds or other obligations [and] to provide a sinking fund for the liquidation of bonds or other evidences of debt.... Any rate too low to meet the foregoing requirements shall be unlawful.

Appellants argued that under this section, any rate which is set so low that a cooperatively-owned utility is unable to pay its debts is unlawful. Their argument, however, failed to consider the statutory definitions of "service" and "system," two key terms which give the above-cited provision its meaning. A utility may impose a charge on its ratepayers only for service, which is defined as "the furnishing of energy, and the rendering of engineering, financial, accounting, or educational services incidental to the production, transmission, or use of energy." I.C. 8–1–13–3(m). Further, the rate a utility charges for the service provided to its ratepayers may include the expenses incurred in the operation of its system, which is defined as "any plant, works, system, facilities, or properties ... used or useful in the generation, production, transmission, or distribution of energy." I.C. 8–1–13–3(e). Marble Hill provided no energy to Wabash's ratepay-

---

**2.** Rates of investor-owned utilities are based on rate of return principles; rates of cooperatively-owned utilities are based on principles of revenue requirements.

**3.** An amended version of I.C. 8–1–13–17 went into effect subsequent to the dismissal of Wabash's petition. The provisions of the amended statute are not applicable here.

ers; therefore, any charge purportedly imposed for service would have been inappropriate here. Likewise, Marble Hill never became "used or useful" in the production of energy; therefore, none of the operation expenses associated with the project were properly chargeable to the Wabash ratepayers.

A utility's rates must be based on service regardless of method employed by the utility to set them. The distinction between rate-of-return ratemaking and revenue-requirement ratemaking is irrelevant in the context of recovering from ratepayers the costs associated with a facility which was abandoned before becoming used or useful. Appellants' argument that *NIPSCO* does not control the outcome of this case based on this distinction was without merit.

### C.

■ Appellants argued that *NIPSCO* was distinguishable from this case because Wabash received the commission's approval to borrow funds for the Marble Hill project, thereby coming under I.C. 8–1–8.5–5.5, which allows a utility, under specified circumstances, to recover the costs associated with a cancelled facility through a rate increase. Appellants, however, are precluded from claiming entitlement to the statute's protections because they waived the issue by not raising it before the commission. Even in the absence of waiver, this statute was not in effect until well after Wabash invested in the Marble Hill project; therefore, it was not applicable to the facts at hand. I.C. 8–1–8.5–5.5 requires that a commission approval certificate be obtained prior to the onset of a project's construction and that the approval be based on an assessment of consumer needs and a determination that the proposed facility will meet those needs. If changes in circumstances subsequently warrant modification or revocation of the approval certificate, the ratepayers are properly chargeable with the costs of the facility since both the decision to undertake and the decision to abandon the project were made following a consideration of their effects on the ratepayers.

Prior to the enactment of the statute, utilities had unfettered discretion to make investment decisions, and it was therefore inappropriate to impose on the ratepayers the cost of decisions that had been entered into with no formal analysis, consideration, and determination of how those decisions would affect them. Even had the statute been in effect when Wabash initiated its Marble Hill investment, the statutory prerequisites were not met such as to trigger the availability of a rate increase to recover the costs of the failed facility. Such recovery is allowed only where the commission has analyzed the risks associated with the proposed facility, held a public hearing, issued a certificate approving the construction, then subsequently revoked or modified the certificate. The commission engaged in no risk analysis and held no public hearing, nor did it issue, much less modify or revoke, an approval certificate. Rather than approving the Marble Hill project, as appellants characterize the commission's actions, the commission approved Wabash's request to borrow the funds necessary to finance the investment project that it had decided to pursue. The decision to abandon the Marble Hill construction came from Public Service Indiana upon its determination that it was financially unable to continue the project. I.C. 8–1–8.5–5.5 does not interdict the applicability of *NIPSCO* to this case.

### D.

■ Appellants attempted to distinguish *NIPSCO* on the basis that Wabash is insolvent, whereas NIPSCO was not. Our determination of who bore the risk of loss for the cancelled nuclear power facility in *NIPSCO* was not based in any way on the utility's financial stability, and appellants cited no other authority from our courts or legislature in support of this argument. Appellants relied on two commission orders which permitted a rate increase to allow utilities to avoid insolvency. Their reliance, however, is misplaced since the order granting the rate increase in both cases specifically excluded the costs of cancelled facilities from the rate base. Wabash's insolvency does not preclude the applica-

tion of the holding in *NIPSCO* to the facts at hand.

### E.

■ REA contended that the resolution of this case by the application of *NIPSCO* would be contrary to the historical basis upon which cooperatively-owned utilities were established, namely, the provision of low cost electricity to rural areas. REA noted that future loans and guarantees from REA to Indiana cooperatives, the loss of which would reduce the availability of low cost electricity in the state, may be jeopardized by such a result. Threats of future sanctions by a federal agency provide no basis for acting in contravention of statutory authority and our own precedent. At the time the Wabash loan was approved, the REA administrator knew or should have known that Wabash's requirements contracts with its members served as the security for the loan and that those contracts provided that the rates paid by the members had to be approved by the commission, and this knowledge was or should have been factored into REA's decision to make the loan. A federal agency is no more protected from the potential for loss due to the insolvency of a debtor than is any other lender.[4] The ability of REA to exercise its discretion in making or refusing to make future loans depending on the outcome of this case may be a business reality, but it is not a justification to ignore otherwise controlling precedent.

Appellants advanced no valid argument which precludes the application of *NIPSCO* to the facts of this case.

### IV. *The commission did not err in dismissing the petition without considering whether Wabash was entitled to emergency rate relief.*

■ Subsequent to the presentation of its case in chief to the commission, Wabash requested leave to file a supplemental or amended petition for emergency rate relief.

The commission granted the request, but advised Wabash that no action would be taken on that petition until after this Court handed down its decision in *NIPSCO*. Wabash then moved for and was granted a temporary stay on its original rate increase petition, but did not file the petition for emergency rate relief, even though it had been granted leave to do so. The commission did not err in refusing to consider and rule on an issue which was never placed before it, and an appellate court will not review issues on appeal that were never before, and therefore never ruled upon, by an administrative body.

### V. *The commission's dismissal of the petition did not violate Wabash's constitutional right not to have its property taken without just compensation.*

■ CFC contended that the commission's order violated Wabash's Fifth Amendment right not to have its property taken without just compensation. Because this issue was not raised before the commission, it was waived. We note, however, that even in the absence of waiver, it is doubtful that Wabash's creditors would have standing to raise this issue and that two courts from other jurisdictions have rejected the argument that the application of the used and useful standard for utility rates amounts to an unconstitutional taking. *See Petition of Pub. Serv. Co.* (1988), 130 N.H. 265, 539 A.2d 263; *Barasch v. Pennsylvania Pub. Util. Comm'n* (1987), 516 Pa. 142, 532 A.2d 325.

The Third District resolved the claims in this appeal in a correct manner and correctly affirmed the commission's decision. Accordingly this Court does now, pursuant to Indiana Rule of Appellate Procedure 11, order that the opinion of the Third District not be vacated or held for naught, but instead that it be and now hereby is in all respects summarily affirmed.

Summary affirmance ordered.

---

**4.** REA also advanced the proposition that a rate set by a state regulatory commission may be implicitly pre-empted by the Rural Electrification Act if the ability of the wholesale coopera- tive to repay its federal loan is seriously compromised, but conceded that no pre-emption question was actually before the court for consideration and determination.

PIVARNIK and DICKSON, JJ., concur.

SHEPARD, C.J., dissents with opinion.

GIVAN, J., dissents. I dissent. I stand on my dissents in *Citizens Action Coal. v. No. Ind. Pub. Serv.* (1985), Ind., 485 N.E.2d 610 and *N. Ind. Pub. Serv. v. Citizens Act. Coal.* (1989), Ind., 548 N.E.2d 153.

SHEPARD, Chief Justice, dissenting.

I agree with the majority's conclusions about most of the statutory and procedural issues presented by this appeal. I do not agree, however, that the constitutional issues presented by the federal parties have been waived. Moreover, I think that these issues cannot really be resolved by issuing a simple dismissal of Wabash Valley's petition in reliance on *Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610. Accordingly, I think the dismissal was erroneous.

The Utility Consumer Counselor claimed in his brief before the Court of Appeals that these issues had not been presented to the Commission. Brief of Office of the Utility Consumer Counselor at 23–24. I am satisfied that National Rural Electric adequately, though barely, preserved the constitutional questions when it resisted the Consumer Counselor's petition to dismiss by asserting that dismissal on statutory grounds would deprive Wabash Valley of rates adequate to survive a Fifth Amendment challenge. Brief of Intervenor National Rural Utilities, Record at 598, 606–609. It is apparent that this assertion presented only a Fifth Amendment takings claim and not a Fourteenth Amendment due process claim. *See generally* Shepard, *Land Use Regulation in the Rehnquist Court: The Fifth Amendment and Judicial Intervention,* 38 Cath.U.L.Rev. 847 (1989).

The parties' debate about waiver before this Court is somewhat different than it was before the Court of Appeals. National Rural Electric seeks transfer on grounds that the Court of Appeals wrongly found waiver. The Consumer Counselor and Wabash Valley Power have both chosen not to respond to this grounds for transfer. Their decision does not operate to concede the issue, but it does yield the field to National Rural Electric.

The merits of the constitutional issues can not be adequately addressed through a motion to dismiss based on our *NIPSCO* opinion. As Justice Rehnquist has written, judicial determinations of Fifth Amendment takings claims are "essentially ad hoc, factual inquiries." *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, 343 (1979). Adjudication of a claim that a regulatory scheme takes a party's property without due compensation in violation of the Fifth Amendment must necessarily be based upon a full evidentiary hearing. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

The rate proceeding initiated by Wabash Valley Power was suspended awaiting this Court's decision in the *NIPSCO* case. It was dismissed promptly afterwards, so there was never developed the sort of full factual record upon which the federal parties' constitutional claims could be adequately addressed. I think these parties are thus entitled to have these claims heard rather than dismissed.

My colleagues express "doubt" that the federal parties have standing to raise these questions when Wabash Valley Power does not do so. The majority does appear to recognize that because the Court rules against the federal parties on grounds of waiver, such "doubt" is not a part of the holding of today's decision. Equally entitled to speculate, I suggest that the creditors are dealing with a debtor which has little interest in seeking rates adequate to pay off. The creditors are in a posture reminiscent of the party who must call a hostile witness in order to prove his case but cannot get much cooperation on the witness stand. In circumstances like that we grant a party the right to lead the witness. I would be inclined to afford the creditors in this litigation the opportunity

to present issues the debtor seems uninterested in pursuing.